GREAT NATIONAL INSURANCE COMPANY and Western Republic Life Insurance Company, Appellants,

v.

Betty Jewell LEGG, Appellee.

No. 6022.

Court of Civil Appeals of Texas.

El Paso.

July 30, 1969.

Rehearing Denied Sept. 10, 1969.

---

Atwell, Malouf & Musselwhite, Anthony Atwell, Dallas, Clark, Thomas, Harris, Denius & Winters, E. Barham Bratton, Mary Joe Carroll, J. Sam Winters, Austin, for appellants.

Warren Burnett, Bob Hoblit, Jerry Childs, Odessa, for appellee.

## OPINION

FRASER, Chief Justice.

The statement and nature of the case is, briefly, as follows: This case involves the commonly-called "double indemnity clause" in these two life insurance polices, by which the companies agree to pay to the beneficiary a specified amount in addition to the amount payable according to the terms of the policy "if the death of the insured results solely from bodily injury caused directly, exclusively and independently of all other causes by external, violent and accidental means". This above-quoted provision of the two policies is what this lawsuit is about. Plaintiff-appellee instituted suit against the defendant-appellants seeking recovery of the additional accidental death benefits, amounting to $10,000.00 in each policy. Neither company contested its obligation to pay the face amount of the policy, but both did dispute the asserted claim to additional benefits under the above-quoted provision. It is undisputed, as will be hereinafter shown, that the insured, James Cecil Legg, died as the result of a gunshot wound inflicted by a .38-calibre Smith & Wesson revolver held by his wife, appellee herein, at a time when the husband was attempting to take the gun away from his wife. Defendants' motions for instructed verdict were overruled and the case was submitted to a jury on special issues, all of which were answered favorably to the plaintiff, and the verdict of the trial court was accordingly rendered in favor of plaintiff. However, only Issues 2 and 3 form the basis of the controversy here on appeal. Issue No. 2 inquired as to whether the insured actually knew that he might be shot as a result of the struggle, and Issue No. 3

inquired whether or not the insured should have known that he might be shot. Appellants maintain that there is no evidence to support the jury's findings as to these issues and that the court should have granted appellants' motions for instructed verdict, judgment N.O.V., and motions for new trial as a matter of law, claiming that the evidence is undisputed that at the very least, the insured should have known that he might be shot as the result of his actions.

■ The law has been clearly established in this state that whether or not the insured met his death as the result of "accidental means", the court must look to the viewpoint of the insured, as opposed to the viewpoint of the claimant; in other words, holding it is the viewpoint of the deceased which must be examined from the evidence, and not that of the claimant.

"Accidental means", as defined in Spencer v. Southland Life Insurance Company, 340 S.W.2d 335 (Tex.Civ.App.1960, wr. ref.), is as follows:

"Death is produced by, or as the result of, accidental means when it is not the natural and probable consequence of the means which produced it, or, stated differently, when death does not ordinarily follow and therefore cannot be reasonably anticipated as the result of the use of such means. Seaboard Life Ins. Co. v. Murphy, 134 Tex. 165, 132 S.W.2d 393.

"The test of whether the killing is accidental within the terms of an insurance policy is not to be determined from the viewpoint of the one who does the killing, but rather from the viewpoint of the insured. Releford v. Reserve Life Ins. Co., 154 Tex. 228, 276 S.W.2d 517; Hutcherson v. Sovereign Camp, W.O.W., 112 Tex. 551, 251 S.W. 491, 28 A.L.R. 823; Life & Casualty Insurance Co. of Tenn. v. Martinez, Tex.Civ.App., 299 S.W.2d 181."

We think that the decision of the trial court should be affirmed.

The facts, as briefly stated as possible, are as follows. James Cecil Legg was found to be dead on arrival at McCamey Hospital. The death was officially classified as homicide resulting from a gunshot wound reported to have occurred at about 12:10 A.M., September 27, 1964. The incident occurred at the T. P. Tavern, about two or three miles outside of the town of McCamey. There is no dispute about the events leading up to the shooting, as they are established by undisputed testimony. On the late afternoon of September 26, 1964, the insured and his wife, the appellee, with their three children, went from their home some twelve miles west of Iraan, to McCamey to the home of the insured's father and step-mother, Mr. and Mrs. Ed Legg. Appellee testified that some time later she heard her husband on the telephone ask, "Nita, is Katherine there?", and heard him tell "Katherine" that he would either be in Iraan at ten or meet her at the T. P., and that he would be alone. In later testimony, appellee identified "Katherine" as a Mrs. Katherine Murray, who, according to the testimony of another witness, had the reputation of being a professional prostitute. Appellee then testified that she told the insured if he wanted that woman, she would give him a divorce, but she wasn't going to put up with that, and that he said, "No, he would never give me up for an old bitch like that". A scuffle and struggle then ensued in which there is conflicting testimony that appellee had a knife which the insured eventually got away from her and threw into another room. The insured's father testified that the insured called for help from his father and step-mother and appellee told him to tell them what was happening, to-wit, that he had "made a date with that God damn bitch", and further that she said, "I'll kill you, I'll kill you", and that he said, "Aw, now".

After the fighting couple had been separated, appellee jumped up and ran out the door and drove away in the family car. There is a lot of testimony by the senior Leggs and appellee, but we think that the foregoing is a sufficient summary of same.

As to the knife, Mr. and Mrs. Legg, Sr., both testified that appellee had it open during the scuffle, but appellee's 11-year-old daughter testified that she did not see her mother with a knife. Appellee stated that she went to a point about three miles out of the town, on the highway leading to Rankin, and while sitting alone in the car parked off the road, she was interviewed by two members of the Highway Patrol, who testified that she had been crying and that the top button of her blouse was torn off and that there was a pistol lying on the cushion beside her, and that she informed them that she and the insured had had a fight or fuss. Shortly thereafter appellee, according to her testimony, drove back into McCamey and ascertained that her husband had borrowed the private car of the Chief of Police. The senior Mr. and Mrs. Legg had testified that prior to this time, insured said he had to get a car and find appellee before appellee killed somebody. The Chief of Police was a Mr. Carroll Locker, who testified that he had loaned the insured his car at about ten or eleven o'clock on the night the insured was shot. Mr. Locker said that he had loaned his car to the insured many times before, and this time the insured's reason was that he wanted to find the appellee and talk to her, and he appeared to be "all tore up". Mr. Ed Legg, in explaining his son's reaction to his wife's leaving, testified that his son was "all tore up" and that he wanted to catch her and find her and talk to her. Mr. Legg further said that his son said she was "going to kill somebody" and he "had to talk her out of it". In his testimony, Mr. Ed Legg also testified that his son had told him that appellee was jealous of anybody that insured talked to, and again reiterated that he was afraid she was going to kill somebody. Appellee made a phone call to Mrs. Ed Legg, who told her that the insured was using Carroll Locker's car. After this conversation, appellee drove back to her home near Iraan to get a change of clothes and freshen up, and while there, she removed from the pickup three guns and put them in the back of her car. She testified that this was because she was prompted by fear that they might be stolen, and she was in a hurry because it was starting to rain and she was afraid the canyons might rise. Appellee then drove back to McCamey, called her husband's step-mother and told her she was going to Rankin, and as she was passing the T. P. Tavern she saw the personal car of the Chief of Police, which she had been told her husband had borrowed, and admitted that she was looking for such car as she was driving by. She drove on up the road, turned around, went back to the T. P., and parked directly behind the car that her husband had borrowed. When her husband looked back and saw her, he got out of the automobile which he had borrowed, came back to the car which she was driving, and stood just behind her on the driver's side of the car with his right hand propped on the top of the car. Thereafter, according to appellee's own testimony, the following events took place:

"A  When he walked up to the car, I said, 'Cecil, what's wrong?'

Q  All right. Was there any reply to that?

A  He said, 'You don't understand, do you?' 'I am a mean son of a bitch.'

Q  Is that the exact words that he used?

A  That's the exact words that he used.

Q  What happened then?

A  And then Mrs. Murray came from the TP around the back of my car and headed right directly to my step-brother's car and I told * * *

Q  You mean the Chief of Police?

A  The Chief of Police's car.

Q  The one that your husband was driving?

A  Yes, sir.

Q  All right, What did you do or what did Mr. Legg, if anything, what did he do?

A  I said, 'Cecil, if that old bitch gets in the car with you I'll blow her head off.'

Q All right. And did he make any reply to that?

A No sir. He just turned and looked at her and then he looked at me and he said nothing.

Q All right. And what happened then?

A I reached in the floorboard and got the .38; she got in the car and sat behind the driver's side, the steering wheel, scooted over just enough go give him room.

Q You mean she moved to the center of the seat of the car is that what you are saying?

A Hardly.

Q All right.

A And I reached in under the floorboard and got the .38, he didn't try to stop me, so I fired in the right side of the rear glass and he just looked at me."

She stated that she thought she had fired only one shot into the car her husband had borrowed, but she realized that she might have fired more than once. She then testified:

"A Well, I was sitting there, I guess, I was just holding the gun in my hand, hung loosely in my hand, and I suppose that he looked at me for a few seconds or maybe a minute or two and then * * * "He's left handed and all at once he just grabbed the end of the barrel and said, 'Let go.' And I said 'No.' And he said, 'Let go.' And I said, 'No.' And about that time he pulled it real had and it hit him here somewhere and all at once he fell."

As stated, appellee also testified that while she was picking up the gun and shooting at the other car, her husband just stood there a few seconds or a moment before he reached in and asked her to give him the gun. The evidence shows that insured was a large man.

Appellants' Points I through V take the position that there is no evidence to support the submission of, or answers to, Issues 2 and 3, which held that the insured knew or should have known that he might get shot as a result of the struggle. However, in our opinion the record fully supports the issues and the answers thereto. There is no evidence of any aggression, threats or warnings passing between the appellee and the insured as he approached her car. Appellee had also testified that in their fifteen years of marriage, insured had never hit or slapped her, and the senior Leggs testified that he did not do so in the scuffle in their presence, but that he was merely trying to hold her hands. As heretofore pointed out in the evidence, the insured merely walked over to the appellee's car and stood there with his right hand on the top of the car. He was a big man, and left-handed. Appellants further make mention of the fact that a few seconds or a moment passed between the time appellee fired into the other car and the time he grappled with her for the gun. No one knows the answer to this, unless it could be speculated that he was surprised and startled for the moment. In any event, he did ask for the gun, and when she refused twice to give it to him, he seized it by the barrel and tried to take it away from her and was killed in the process. It must be borne in mind that she was not threatening to kill him; she had not shot at him, but was firing the pistol into the car where Katherine Murray was somewhere positioned. Appellants' position does not seem sound because, to follow it through logically, their position is that he should not have attempted to prevent her from killing anybody else, but should just stand there and let her fire away. Our view of the evidence is that he was trying to prevent any further shooting, and if he was startled or stunned by the first shot or two fired by his wife at the other car, it would not be an unusual state of mind for a person in his position and under the attending circumstances. Therefore, we feel that the insured did not have any real reason for knowing or anticipating that his wife might

shoot him. He had stated to several people that he was going to get a car and try to talk her out of killing "somebody"—not him, but "somebody". This is confirmed by sev-several witnesses. As stated before, he was "all tore up" and trying to get a car to find her and try to talk her out of killing somebody.

Appellants have cited a great number of cases where double indemnity has been denied. We have checked and reviewed these cases, and they are all situations where the insured or deceased was making threats, acting aggressively, advancing toward a person with a weapon in spite of warnings and threats and, in several cases, had already either cut or attacked the other party. In one of the cases the insured had already cut his wife with a razor, and in another the husband was shot in a scuffle for a rifle after he had threatened his wife, who was holding a year old baby on her lap. Other cases show the insured bursting through the door and otherwise advancing in an aggressive and threatening manner in spite of warnings and admonitions to cease and desist. We see no similarity in those cases and the one before us. Appellants place great emphasis on the case of Koester v. Mutual Life Ins. Co. of New York, 6 W.W.Harr. 537, 179 A. 327 (Del. S.Ct.1934). We have studied this case, and it must be noted that here the husband and wife had been living apart for a couple of months or so; he came to visit her and they had an argument about the retention of a practical nurse, as the wife was recovering from an appendectomy. The husband said she ought to have a gun to protect herself, and she replied she already had one and produced it to show him; whereupon he said, "You are in no condition to have that. Give it here." She refused and in the struggle he was killed. That case does bear some similarity to the case before us, but it is a Delaware, and not a Texas case, and we think there are differences in the fact situation and do not believe it is as persuasive or important as the appellants have maintained. We have not found any cases in Texas cited by appellants to substantiate their position.

There are several Texas cases where double indemnity has been denied, such as Stevenson v. Reliable Life Insurance Co., 427 S.W.2d 945 (Tex.Civ.App.). Here, the insured had knocked his wife down and started to hit her with a two by four board, which blow was received by a nephew, thus allowing appellant the opportunity of regaining her feet and pulling a pistol from her bosom. Despite her repeated verbal warnings, the insured continued to advance on her, and she began firing and killed him. Also, in Spencer v. Southland Life Ins. Co., 340 S.W.2d 335 (Tex. Civ.App.), the insured, after being stopped for a traffic violation, drew a shotgun from his truck. It was only after twice warning the insured to put down the gun and after insured pointed the gun at the officer, that the officer pulled his pistol and shot the insured. And in Perry v. Aetna Life Insurance Company of Conn., 380 S.W.2d 868 (Tex.Civ.App., wr. ref. n. r. e.), the insured was shot by his wife while breaking into the house she occupied, despite her warnings that she would shoot him if he continued. These cases are obviously fatally different from the case at bar, and set forth what we think the law is and should be in the State of Texas. These cases point up with undeniable clarity the existence of aggression, threats and warning, none of which are present in this case. Appellants' first five points are therefore overruled.

Appellants' Points VI, VII, and VIII complain that the court erred in rendering judgment against these appellants because deceased, as a matter of law, was committing an assault at the time and on the occasion in question (appellee did testify that he was pulling so hard on the pistol that it pulled her up against the side of the car and bruised her ribs and midriff), and that there was no evidence or insufficient evidence to support the jury finding that the deceased was not committing an assault

on his wife. We find no error set forth here, and these points are accordingly over-ruled, as it is obvious that in pulling on the gun, which appellee had in her hand, she could well have been bruised, but not intentionally so, by the insured. It must be noted that there is no evidence by appellee that he was assaulting her, but was merely trying to obtain the gun, and she got bruised in the process.

■ Appellants' Point IX complains that the trial court erred in excluding testimony offered both for the purpose of impeachment and as an admission of appellee. To this action the appellants excepted. The excluded testimony would show that on May 24, 1967, appellee threatened a Mrs. Fields, her landlady, with a gun for having turned off her electricity. Mrs. Fields replied that she could not turn the electricity back on, as her husband had the keys and was in town. In answer to a question, Mrs. Fields testified, "Well, she said, 'I ought to just shoot you, I have already killed once and I had already gotten out of that killing and if I have to kill one more time it won't hurt'". We do not think the court committed any error in excluding this testimony, as it was three years after the death of the insured; therefore, in our opinion, not particularly relevant, and certainly subject to some doubt that appellee was the same person in 1967 that she was in 1964. She did not shoot Mrs. Fields, and in our opinion such testimony could possibly prejudice her in the minds of the jury. It further appears that a proper predicate for such testimony was not laid. This point is therefore overruled.

■■ We come now to appellee's cross-assignment. In Cross-Assignment 1, appellee argues that the trial court erred in granting a judgment N.O.V. concerning penalty, interest and attorneys' fees against cross-appellant when there was evidence of probative force to support the jury's finding in this regard. We do not think this cross-assignment can be sustained. It must be borne in mind that the statutory provision governing the matters under this point has been declared to be penal in nature, and must be strictly construed. Also, it has been held that forwarding proofs of death or filing suit does not constitute a demand within the meaning of the aforementioned article. Therefore, we feel that the cross-appellees had reasonable justification for interpleading the main amount of the policy and denying the double indemnity feature. On November 28, 1964, after insured's death, cross-appellant sent cross-appellees a letter claiming accidental death benefits with a death certificate attached to the letter. This certificate listed "Homicide" as the cause of death, and described the incident as follows: "Grabbed barrel end of gun away from another and before moving end away it went off". We think cross-appellees were well within their rights, as they had readily interpleaded the face amounts of the policies, and under the circumstances would, in our opinion, have had some doubts as to paying the double indemnity of $10,000.00 on each policy. The cross-appellees made a private investigation. They further maintained that cross-appellant's letter from her attorneys, which reads as follows: "This is to give you notice of the claim of Betty Legg, the beneficiary under the above listed policy, for the accidental death of her husband, the insured. Mrs. Legg has employed this law firm to collect the proceeds under the above captioned policy in her behalf. Please find enclosed a Xerox copy of the death certificate for James Cecil Legg", along with other letters sent by and on behalf of the cross-appellant to the insurance companies, were all answered, not by denials of liability, but by requests, as authorized in the policies themselves, for satisfactory written proof that cross-appellant was entitled to receive the proceeds of the policies and the additional benefits requested. Cross-appellees also claim that they did not know cross-appellant was claiming accidental death benefits, because the death certificate indicated "Homicide". Therefore, we do not feel that cross-appellant is entitled to recover the statutory interest and penalty and attorneys' fees. With regard to attorneys'

fees, we do not think the evidence sufficient, as it consists only of an opinion by another lawyer after he had been shown the file and then told about the lawsuit. We feel that sufficient evidence was not produced or a predicate laid to entitle cross-appellant to attorneys' fees. Therefore, cross-appellant's Cross-Assignment 1 is overruled, and we hold that the trial court was correct in so holding.

In accordance with the above findings, we overrule all of appellants' points of error and also overrule cross-appellant's Cross-Assignment 1.

The judgment of the trial court is accordingly affirmed.